IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MICHAEL NIEWIEDZIAL,                )
                                    )
            Plaintiff,               )
                                    )
vs.                                 )    Case No. 3:23-CV-2961-MAB[1]
                                    )
DENNIS LARSON and                    )
BRIDGET ALECCI, now known as         )
Bridget Wiggins,                     )
                                    )
            Defendants.              )

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Plaintiff Michael Niewiedzial filed this lawsuit pursuant to 42 U.S.C. § 1983 against

Dr. Dennis Larson and Nurse Bridget Wiggins alleging that they provided him with

constitutionally deficient medical care for his broken finger while he was incarcerated at

Big Muddy River Correctional Center (Docs. 1, 14; *see also* Docs. 11, 17). This matter is

currently before the Court on the motion for summary judgment filed by Defendants

(Doc. 54), which is unopposed due to Plaintiff's failure to file a response in opposition.

For the reasons outlined below, the motion is granted.

## BACKGROUND

Plaintiff Michael Niewiedzial alleged that in February 2023, his cell door was

closed on his hand, crushing three of his fingers (Doc. 14, p. 13). Plaintiff was taken to the

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (*see* Doc. 26).

hospital the next day, where he learned his middle finger was broken (*Id.* at pp. 13–14). The wound on his middle finger was glued shut, and his three fingers were buddy-taped together (*Id.* at p. 14). Plaintiff alleged that upon his return to Big Muddy, Nurse Bridget Wiggins changed the dressings on his fingers twice a day, and he expressed concerns to her about continued bleeding, his fingers being incorrectly taped, the need for a splint on his middle finger, and the need to see a hand surgeon (*Id.* at pp. 14–15). According to Plaintiff, Nurse Wiggins did not relay any of his concerns or requests to Dr. Larson (*Id.*).

Plaintiff further alleged that his hospital discharge papers ordered that he be seen by a hand surgeon one week after the incident (Doc. 14, p. 15). Dr. Larson told Plaintiff that a hand surgeon would not see him that quickly and Plaintiff was not taken to see an orthopedic surgeon until six weeks after his injury (*Id.*). Plaintiff alleged that the surgeon immediately splinted his middle finger because it was deformed and told him to wear the splint for four weeks (*Id.*). The surgeon allegedly informed Plaintiff that he had waited too long for the finger to properly heal on its own and it would require surgery to straighten (*Id.*). Plaintiff alleged that he was never taken for a follow-up with the surgeon and his finger is now severely deformed (*Id.* at p. 16).

Following a threshold review of the First Amended Complaint, pursuant to 28 U.S.C. § 1915A, Plaintiff was permitted to proceed on an Eighth Amendment deliberate indifference claim against Dr. Larson and Nurse Wiggins (Doc. 17).

Defendants Larson and Wiggins filed their motion for summary judgment on November 19, 2025 (Doc. 54; *see also* Doc. 55). They provided the required notice to Plaintiff regarding the consequences of failing to respond to the motions for summary

judgment (Doc. 56). *See Bryant v. Madigan*, 84 F.3d 246, 248 (7th Cir. 1996); *Timms v. Frank*, 953 F.2d 281, 285 (7th Cir. 1992); *Lewis v. Faulkner*, 689 F.2d 100, 102 (7th Cir. 1982); SDIL-LR 56.1(j). However, to date, Plaintiff has not filed a response to the motion for summary judgment nor sought an extension of time to do so.

## FACTS

Plaintiff's failure to respond to Defendants' motion for summary judgment is deemed an admission that Defendants' version of the facts is true. SDIL-LR 56.1(g) ("All material facts set forth in a Statement of Material Facts . . . shall be deemed admitted for purposes of summary judgment unless specifically disputed."). Therefore, the facts asserted by Defendants are deemed admitted to the extent that they are supported by evidence in the record. *See* FED. R. CIV. P. 56(e)(2); *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012) (citations omitted). Defendants' facts are also supplemented by additional facts the Court discerned during its own review of the evidence that it believed relevant to the issues at hand.

At the time of his injury in February 2023, Plaintiff was 60 years old with an extensive medical history (Doc. 51-1, para. 7; *see also, e.g.,* Doc. 55-10, pp. 155–161). He had multiple chronic conditions, including diabetes, congestive heart failure, high cholesterol, and chronic kidney disease (Doc. 51-1, para. 7). He had also undergone a hip replacement, part of his left foot had been amputated, the big toe on his right foot had been amputated, he was morbidly obese, and he was wheelchair-bound since before his imprisonment (Doc. 55-1, para. 7; Doc. 55-5, pp. 66, 69; Doc. 55-12, pp. 10, 14–15).

On Sunday, February 19, 2023, at around 6:00 p.m., Plaintiff's cell door was

slammed on his fingers (*see, e.g.,* Doc. 55-1, pp. 13–14; Doc. 55-3, p. 89; Doc. 55-12, pp. 25–26). A correctional officer immediately took Plaintiff to the healthcare unit, where he was seen by a nurse (Doc. 55-12, p. 28; Doc. 55-1, p. 2, para. 8; *see also id.* at pp. 13–14). According to Plaintiff, his finder was bleeding (Doc. 55-12, p. 28), but the nurse's notes state there was "no bleeding upon arrival to HCU" (Doc. 55-1, p. 13). The nurse also noted Plaintiff's finger was stiff but there was no swelling, edema, or disfigurement (*Id.* at pp. 13–14). It is undisputed that the nurse cleaned and bandaged the laceration on Plaintiff's finger (*Id.*; Doc. 55-12, p. 29). The following day at 11:25 a.m., Plaintiff saw Dr. Larson (Doc. 55-1, p. 2, para. 9; *see also id. at* pp. 15–16).[2] Dr. Larson ordered Plaintiff to be sent to the Good Samaritan Regional Health Center Emergency Department (Doc. 55-1, p. 2, para. 9). Dr. Larson also prescribed Tylenol #3 for one month for pain (*Id.*).

At the hospital, a nurse practitioner noted lacerations on both the top (dorsal) and bottom (palmar) sides of Plaintiff's left middle finger, which were not bleeding, with swelling and bruising on the middle and ring fingers (Doc. 55-1, p. 2, para. 11; Doc. 55-10, p. 157).[3] An x-ray was taken of Plaintiff's hand, which showed he had a comminuted fracture to his middle finger.[4] The nurse practitioner cleaned the lacerations on Plaintiff's

---

[2] Dr. Larson's notes in the medical chart are largely illegible (*see, e.g.,* Doc. 55-1, pp. 15–17, 23, 26, 29, 35–37, 39, 44). The Court is therefore almost entirely reliant on Dr. Larson's representations as to what his notes say (Doc. 55-1, pp. 1–8 (Larson Decl.)). Dr. Larson did not provide a word-for-word transcription of what is in his notes but rather just provided very select information from each note (*see* Doc. 55-1, pp. 1–8).

[3] The entire record from the emergency room visit is at Doc. 55-10, pp. 152–205.

[4] A comminuted fracture is when the bone shatters into three or more pieces. ORTHOINFO, *Fractures (Broken Bones)*, https://orthoinfo.aaos.org/en/diseases--conditions/fractures-broken-bones/ [https://perma.cc/VX4K-TEFU] (last visited June 18, 2026). This type of fracture occurs from a very forceful event and is frequently associated with crush injuries. *See id.*

finger, glued them shut, and bandaged them (*Id.* at p. 158). She then buddy-taped Plaintiff's fingers with padding because "[a]ccording to guards, patient can't have metal or wood splinting" (*Id.* at p. 159).[5] Plaintiff's discharge instructions were to follow-up with Dr. Larson in one week and to "schedule an appointment as soon as possible" with an orthopedic surgeon (Doc. 55-10, pp. 160, 194).

Dr. Larson saw Plaintiff when he got back from the hospital and prescribed Keflex 500 mg (an antibiotic) twice a day for ten days and Neurontin 800 mg (nerve pain medication) twice a day for five months (Doc. 55-1, p. 3, para. 17; *see also id.* at p. 17). Dr. Larson also wrote that he would seek approval for a referral to an orthopedist "ASAP" (Doc. 55-1, p. 17). Dr. Larson stated in his declaration that he "completed a Medical Special Services Referral and Report for [Plaintiff] to be referred to an orthopedist" that same day (Doc. 55-1, p. 3, para. 17).[6] But Dr. Larson was not involved in scheduling patients for visits with outside providers (*Id.* at para. 18).

According to Plaintiff, for the next 14 days, the laceration on his middle finger continued to bleed through the glue that was applied at the hospital (Doc. 55-12, p. 62). Plaintiff testified that he was sent to the healthcare unit for daily dressing changes to have his wound cleaned, the bandage changed, and his fingers re-taped (Doc. 55-12, pp. 37–38, 62–63). Plaintiff could not recall how long that went on but said it was only a matter

---

[5] Dr. Larson explained that "[b]uddy taping is the practice of bandaging an injured finger to an uninjured one" whereby "[t]he uninjured finger acts as a sort of splint." (Doc. 55-1, p. 3, para. 3).

[6] Dr. Larson did not, however, provide a citation to the actual referral document (*see id.*), nor did the Court come across the referral—or the approval of the referral—during its own review of the medical records.

of days (*Id.* at p. 38). He testified that various nurses performed these dressing changes, but he could not recall how many times Nurse Bridget Wiggins did it (*Id.*). (Later, he testified that Nurse Wiggins was the only nurse who taped his fingers (*Id.* at pp. 51–52)). Plaintiff testified that he asked Wiggins, "why won't you put me in a splint?" and she said he did not need one (*Id.* at p. 39). Plaintiff testified that Nurse Wiggins taped his fingers differently than the hospital, but he could not explain how, and he claimed that it "caused the - - the bend to stay bent." (*Id.* at pp. 50, 51).

Nurse Wiggins submitted a declaration asserting that, as a nurse, it was outside the scope of her practice to determine treatment for a finger fracture, including whether and how to immobilize the injured finger (Doc. 55-11, para. 4). She stated that if she saw an inmate for the purpose of changing the tape of their buddy-taped fingers, and the inmate complained about wanting a splint or voiced concern about their finger not healing properly, she would have instructed the inmate to submit a sick call request to be seen by a nurse who could assess the patient and determine whether to refer the patient to a medical doctor or a mid-level provider (like a nurse practitioner) (*Id.* at para. 5). She would also chart the inmate's complaints, her observations, and her plan in the inmate's medical record (*Id.*). Nurse Wiggins further asserted that if she observed that an inmate was "bleeding from a repaired wound," she would chart the inmate's complaints and her observations in the patient's medical record and refer the inmate to the doctor or a mid-level provider (*Id.* at para. 3). Nurse Wiggins stated that after reviewing Plaintiff's medical records, there is no documentation from her that she ever observed blood from Plaintiff's repaired wound on his finger or that he ever asked her for a splint or

complained that his finger was healing improperly (*Id.* at para. 6). In fact, there does not appear to be any documentation of the dressing changes in the medical records submitted to the Court. Neither Nurse Wiggins nor Dr. Larson cited to any such record (*see* Doc. 55-1, Doc. 55-11), and the Court did not come across any during its own review of the medical records (*see* Docs. 55-1 through 55-10).

The medical records show that on February 25th—six days after Plaintiff injured his finger—he submitted a request asking to be seen due to pain in his foot and knees and cellulitis in his legs (Doc. 55-1, p. 22). He said nothing about his finger bleeding or being improperly taped (*see id.*).

On March 3rd, Plaintiff was seen in nurse sick call for his foot, knee, and leg pain (Doc. 55-1, p. 21). He also reported needing an evaluation of his injured finger (along with various other unrelated issues) (*see id.*). But there is nothing in the note about his finger still bleeding or being improperly taped (*see id.*). The nurse referred Plaintiff to see a physician (*Id.*).

On March 7th, Plaintiff submitted a request to Dr. Larson, stating "I was told by hospital I have appointment for a hand doctor already scheduled for one week after accident[.] [I] need follow [sic] appointment with you." (Doc. 55-1, p. 28). Plaintiff said nothing about his finger bleeding or being improperly taped (*see id.*).

On March 9th, Plaintiff was seen again in nurse sick call for pain/discomfort in his feet, legs, and left hand (Doc. 55-1, p. 27). The nurse observed that Plaintiff had a bandage on his left hand, and Plaintiff told the nurse (amongst other things) that he needed to have a follow-up appointment due to his finger injury (*Id.*). There is nothing in the note

about his finger bleeding or being improperly taped (*see id.*). The nurse referred Plaintiff to see a physician (*Id.*).

As a result of the referrals, Plaintiff saw Dr. Larson on March 10th, where he complained of foot, finger, and knee pain (Doc. 55-1, p. 4, para. 23; *see also id.* at pp. 26, 29). Dr. Larson recounted only that he increased the dosing frequency of Plaintiff's Neurontin from two times per day to three times per day (Doc. 55-1, p. 4, para. 23). The Court is unable to make out anything else that Dr. Larson wrote in the note (*see* Doc. 55-1, pp. 26, 29).

On March 14th, Plaintiff was seen again in nurse sick call for an unrelated matter, and there is no mention in the note about Plaintiff's finger (Doc. 55-1, p. 31). Plaintiff then saw Dr. Larson again on March 20th regarding the unrelated matter, as well as his finger (Doc. 55-1, p. 4, para. 26; *see also id.* at pp. 35–37). Dr. Larson recounted that he ordered x-rays of Plaintiff's left hand and third finger and prescribed Tylenol #3 for one month (Doc. 55-1, pa. 4, para. 26). The Court was also able to make out that Dr. Larson wrote in the note that Plaintiff had "not yet seen ortho[pedist]" (Doc. 55-1, p. 35).

The x-ray was taken on March 29th and showed a fractured left middle finger, specifically a "comminuted fracture deformity involving the middle finger middle phalangeal shaft with associated overlying soft tissue swelling" (Doc. 55-6, p. 41 (x-ray report); *see also* Doc. 55-1, p. 5, para. 27; *id.* at p. 41).[7] On April 5, 2023, a clerk wrote in

---

[7] The middle phalangeal shaft is the bone in the middle of the finger. ORTHOINFO, *Finger Fractures*, https://orthoinfo.aaos.org/en/diseases--conditions/finger-fractures/ [https://perma.cc/9XL9-CQGM] (last visited July 1, 2026). The anatomy of a finger from tip to base is as follows: The distal phalanx (or phalangeal shaft) is the bone that comprises the fingertip section. Below that is the distal interphalangeal

Plaintiff's medical chart that he had been scheduled for a consultation "for his knee and hand" on April 14, 2023, with Dr. Peter Mulhern (Doc. 55-1, p. 5, para. 28; *see also id.* at p. 44), who is an orthopedic surgeon at Deaconess Illinois Specialty Clinic (Doc. 55-1, p. 5, para. 29).

According to Dr. Larson, Plaintiff saw Dr. Mulhern as scheduled on April 14th (Doc. 55-1, p. 5, para. 29).[8] Dr. Larson summarized Dr. Mulhern's note from that visit as follows:

> Dr. Mulhern charted [Plaintiff] recently had a crush injury to the left middle finger and had some limited mobility across the distal interphalangeal joint (the DIP joint near the tip of the finger). On examination of [Plaintiff's] left hand, Dr. Mulhern charted there was some diffuse swelling and some tenderness around the [DIP] joint, but [Plaintiff] had fairly good mobility across the proximal interphalangeal joint (the PIP joint in the middle of the finder) and the [DIP] joint without any mallet deformity.[9] Dr. Mulhern charted his neurovascular examination of [Plaintiff's] hand was otherwise normal.

(Doc. 55-1, p. 5, para. 29–30) (parentheticals added). Dr. Larson did not mention what Dr. Mulhern's plan or course of treatment was with respect to Plaintiff's finger (*see id.*). And

---

joint (or "DIP"). Next comes the middle phalanx, which is the bone that comprises the middle section of the finger. After that is the proximal interphalangeal joint (or "PIP"), which is the knuckle in the middle of the finger. And then the proximal phalanx, which is the bone that comprises the base section of the finger. The knuckle that connects the finger to the palm of the hand is the metacarpophalangeal joint. *Id.*

[8] Dr. Mulhern's note from the visit, which is purportedly Bates-stamped "Niewiedzial 002598" (*see* Doc. 55-1, p. 5, para. 29), is not included in the record (*see* Docs. 55-1 through 55-10). Dr. Larson provided the Court with over 1,200 pages of Plaintiff's medical records (including hundreds of pages of duplicative and/or irrelevant records, such as dental records, optometry records, and Plaintiff's receipt of extra toilet paper). Those records are Bates stamped 000433 through 001321 and 001520 through 001573 (*see* Docs. 55-1 through 55-10). There are no medical records with a Bates stamp past 001573. The Court was only provided with Dr. Larson's own summary of Dr. Mulhern's note from April 14, 2023 visit (Doc. 55-1, p. 5, para. 29, 30)

[9] A mallet deformity is where the tip of finger droops downward (Doc. 55-1, p. 6, para. 34).

Dr. Mulhern later noted that they "really did not talk about [Plaintiff's] left middle finger" at this visit because "the purpose of the visit was to evaluate [Plaintiff's] knees" (Doc. 55-5, p. 68).

Another x-ray of Plaintiff's hand was performed on April 19th per Dr. Larson's orders (Doc. 55-6, p. 42 (x-ray report); *see also* Doc. 55-1, p. 5, para. 31; *id.* at p. 53). The x-ray report indicates "fracture[d] third middle phalanx. Some healing however no complete bony union. Osteopenia with degenerative changes.[10] Soft tissue swelling." (Doc. 55-6, p. 42). A clerk's note in the prison medical chart on April 20th indicates that an orthopedic consultation for Plaintiff's "finger/hand" had been scheduled for April 24, 2023 (Doc. 55-1, p. 51).

Plaintiff saw Dr. Mulhern as scheduled on April 24th (Doc. 55-1, p. 5, para. 32; Doc. 55-5, pp. 66–70). Dr. Mulhern noted that since Plaintiff's injury:

> [h]e has persisted with some diffuse swelling of the left middle finger and some pain although that pain has improved with his mobility. He is no longer using the buddy taping for the finger he still has difficulty getting to full extension across the DIP joint however. . . . [T]here is some diffuse swelling and some tenderness around the DIP joint but he actually has fairly good mobility across the PIP joints with a mild mallet deformity. Neurovascular exam to the hand is otherwise normal.

(Doc. 55-5, pp. 68, 69).

Dr. Mulhern reviewed the x-rays that were taken that day and noted

> the fracture of [Plaintiff's] left middle finger middle phalanx appears to still be in good position and alignment. This was more of a transverse fracture

---

[10] Osteopenia is lower than average bone density, but not low enough to be classified as osteoporosis. CLEVELAND CLINIC,*Osteopenia*, https://my.clevelandclinic.org/health/diseases/21855-osteopenia [https://perma.cc/XFV8-QJ4M] (last visited July 1, 2026).

and there is abundant callous formation around the fracture in all views. This did not appear to extend to the DIP joint but I think that the appearance of a mallet finger is secondary to the location of the fracture and interfering with the extensor tendon.

(Doc. 55-5, p. 69; *see also id.* at p. 70 (language from x-ray report)). For treatment, Dr. Mulhern recommended that Plaintiff use a Stax splint, which he applied that day (*Id.* at p. 70).[11] Dr. Mulhern further recommended that Plaintiff:

Us[e] [the splint] for at least another four weeks and then he can probably just remove it and leave it off. Since this fracture is progressing to heal without complication I'm not overly concerned about his finger at this point as this will continue to heal and mature so that he will not have any significant local pain or tenderness over the next six weeks. I do not think any further X-rays or follow up for the finger is necessary but we will see him back to review the results of his MRI for the knee and discuss the further treatment of his knees.

(*Id.*). Dr. Larson indicated that Plaintiff saw Dr. Mulhern again on July 20, 2023, "related to his knees only" (Doc. 55, p. 7, para. 41).[12]

Plaintiff testified at his deposition in September 2025 that he still had pain in all three of his fingers, which he rated as an eight or nine out of ten, and that nothing helps with the pain (Doc. 55-12, pp. 53–54). He also said the tip of his middle finger bends down (*Id.* at p. 45). He claims he was told by a doctor, whom he could not identify, that the reason his finger bent down was because Dr. Larson was negligent in not putting him in

---

[11] A Stax splint is a plastic split that slides over the finger tip and is used to treat mallet deformity. It holds the tip of the finger (the DIP joint) completely straight while allowing the middle joint (the PIP joint) to bend (Doc. 55-1, p. 6, para. 36).

[12] Dr. Larson once again cited to Dr. Mulhern's notes from this visit in his declaration (Doc. 55-1, p. 7, para. 41) (citing Niewiedzial 002584–2588), but failed to actually provide Dr. Mulhern's notes to the Court (*see* Doc. 55-1 through 55-10).

a splint (*Id.* at p. 47). Plaintiff further claims that "the doctor that put the splint on my hand"—presumably Dr. Mulhern—told him that he needed surgery on his finger and "[t]hat it needed to be rebroke" (*Id.* at pp. 46–47). Plaintiff was asked whether he is still able to use his left hand, and he said he "can grab and hold things, but when it comes to writing, or - - or holding, or - - I can't do nothing with it" (*Id.* at p. 54; *see also id.* at p. 55). But Plaintiff then confirmed that he is actually right-handed; he writes with his right hand and generally uses his right hand to grab things (*Id.* at p. 55). Plaintiff stated, "I can grab something with my left hand, but I can't function with it," but he refused to elaborate on what he meant by that or to give examples of what he cannot do with this left hand (*Id.* at pp. 55–56).

## LEGAL STANDARD

Summary judgment is proper only if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Instead, the court's task is to view the record and draw all reasonable inferences in the light most favorable to the non-moving party and decide if there is a genuine material dispute of fact that requires a trial. *Stewart*, 14 F.4th at 760; *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014). "Only if the court can say, on that sympathetic reading of the record, that no finder of fact could reasonably rule in

the unsuccessful movant's favor may the court properly enter summary judgment against

that movant." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015).

Where, as here, "a nonmovant fails to respond to a motion for summary judgment,

the movant 'still ha[s] to show that summary judgment was proper given the undisputed

facts,' with those facts taken as usual in the light most favorable to the nonmovant."

*Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (quoting *Yancick v. Hanna Steel Corp.*,

653 F.3d 532, 543 (7th Cir. 2011)).

## DISCUSSION

To prevail on an Eighth Amendment claim for inadequate medical care, a plaintiff

must prove that he had an "objectively serious" medical condition to which prison

officials acted with "subjective deliberate indifference." *E.g., Reck v. Wexford Health

Sources, Inc.*, 27 F.4th 473, 483 (7th Cir. 2022). For the purposes of summary judgment,

Defendants do not dispute that Plaintiff's broken finger was an objectively serious

medical condition (*see* Doc. 55). Therefore, the only question for the Court is whether the

evidence, when viewed in a light most favorable to Plaintiff, establishes an issue of fact

as to whether Defendant Larson and Nurse Wiggins acted with deliberate indifference.

"A prison official is deliberately indifferent only if he 'knows of and disregards an

excessive risk to inmate health or safety.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d

658, 662 (7th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "This is a

high bar 'because it requires a showing [of] something approaching a total unconcern for

the prisoner's welfare in the face of serious risks.'" *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th

Cir. 2022) (quoting *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)). "Mere medical

malpractice or a disagreement with a doctor's medical judgment is not deliberate indifference." *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (citations omitted). *Accord Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016) (en banc) ("[N]egligence is not enough."). The deliberate indifference standard is "essentially a criminal recklessness standard, that is, ignoring a known risk." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (citation omitted). *Accord Perez v. Fenoglio,* 792 F.3d 768, 777 (7th Cir. 2015) ("The deliberate indifference standard reflects a mental state somewhere between the culpability poles of negligence and purpose, and is thus properly equated with reckless disregard.")

When it comes to medical professionals, "[t]here is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field." *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (citation omitted). For that reason, a medical professional's treatment decision is entitled to deference so long as the decision was based on professional judgment, meaning it was "fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm and the efficacy of available treatments." *Roe v. Elyea*, 631 F.3d 843, 857, 859 (7th Cir. 2011). *See also Perez,* 792 F.3d at 777 ("Prison officials must provide inmates with medical care that is adequate in light of the severity of the condition and professional norms.").

"But deference does *not* mean that a defendant automatically escapes liability any time he invokes professional judgment as the basis for a treatment decision." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (emphasis in original). There are a variety of

circumstances from which a jury can reasonably infer that the medical professional acted with deliberate indifference, including when the medical professional administers "blatantly inappropriate" treatment;[13] disregards the recommendation of specialists;[14] makes a treatment decision that is "a substantial departure from accepted professional judgment, practice, or standards";[15] and causes an inexplicable delay in providing medical care.[16] *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022); *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015).

When it comes to delays in providing medical care, the Seventh Circuit has observed that "some delay [is] inevitable" due to the "limited resources" that correctional facilities have. *Zemlick v. Burkhart*, 164 F.4th 1004, 1014 (7th Cir. 2026) (quoting *Mitchell v. Kallas*, 895 F.3d 492, 500 (7th Cir. 2018)). But an inexplicable delay that serves no penological purpose and exacerbates the inmate's injury or unnecessarily prolongs his pain may constitute deliberate indifference. *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017); *Petties*, 836 F.3d at 731. "[T]he length of delay that is tolerable depends on the

---

[13] *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *see also Petties*, 836 F.3d at 729 (a jury can infer deliberate indifference when "a risk from a particular course of medical treatment (or lack thereof) is obvious.").

[14] *Perez*, 792 F.3d at 777 (citing *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011)).

[15] *Petties*, 836 F.3d at 729. *See also Pyles*, 771 F.3d at 409 ("A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances'"); *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) ("[T]he decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.").

[16] *Goodlow v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (citing *Petties*, 836 F.3d at 731). *See also Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) ("A delay in the provision of medical treatment for painful conditions—even non-life-threatening conditions—can support a deliberate-indifference claim.")

seriousness of the condition and the ease of providing treatment." *McGowan v. Hulick,* 612 F.3d 636, 640 (7th Cir. 2010). A delay in providing treatment is only actionable under the Eighth Amendment if the plaintiff can provide "verifying medical evidence" that the delay—rather than the inmate's underlying condition—caused some degree of harm. *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007). "That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." *Id.* at 715.

### A. DR. DENNIS LARSON

Plaintiff contends that Dr. Larson was deliberately indifferent because he failed to provide Plaintiff with a splint and delayed sending Plaintiff to see a specialist (*see* Doc. 14; Doc. 17; Doc. 55-12, p. 52).

The Court turns first to the issue of a splint. As an initial matter, the Court notes that the undisputed evidence in this case shows that buddy taping is, in fact, a *type* of splint (Doc. 55-1, p. 3, para. 16). *See also, e.g.,* Sung Hun Won, et al., *Buddy Taping: Is It a Safe Method for Treatment of Finger and Toe Injuries,* 6 CLINICS IN ORTHOPEDIC SURGERY 26, 26 (2014) ("Buddy taping is the act of bandaging a damaged finger or toe together with a healthy one. The healthy digit acts as a splint, keeping the damaged one in a natural position for healing."). Plaintiff, however, believes Dr. Larson should have provided him with some other type of splint. But Plaintiff did not put forth any expert testimony or other evidence that splinting was essentially mandated by accepted professional standards such that Dr. Larson's decision *not* to splint raised an inference of deliberate indifference. *See Petties*, 836 F.3d at 729; *Pyles*, 771 F.3d at 409. Nor can the Court say that

Dr. Larson's decision was so obviously wrong that a layperson could draw the required inference about the doctor's state of mind without expert testimony.[17]

While Plaintiff claims that some unidentified doctor said his finger should have been splinted earlier, this statement is inadmissible hearsay. *See Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023) ("To be considered on summary judgment, evidence must be admissible at trial, . . . If the evidence is inadmissible hearsay, the courts may not consider it."); *Page v. Obaisi*, 318 F. Supp. 3d 1094, 1104 (N.D. Ill. 2018) (rejecting prisoner's statement about what a doctor allegedly told prisoner's sister as inadmissible double hearsay). Moreover, this statement is too vague to have any evidentiary value and create an issue of fact. *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (citations omitted).

Accordingly, the Court concludes there is no evidence in this case that supports an inference that Dr. Larson knew a splint was warranted but simply chose not to prescribe one. Even if it had been prudent for Dr. Larson to splint Plaintiff's finger, his failure to choose the best course of action does not amount to a constitutional violation. *See Arnett*, 658 F.3d at 754 ("[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible . . . .") (citation omitted). *See also Pyles*, 771 F.3d at 409 ("Disagreement between a prisoner and his doctor . . . about the proper course of

---

[17] *See, e.g.,* AM. FAM. PHYSICIAN, *Common Finger Fractures and Dislocations*, https://www.aafp.org/afp/2022/0600/p631#afp20220600p631-b11 [https://perma.cc/7WCU-4M39] (last visited July 18, 2026) (indicating that buddy taping is an appropriate treatment for some middle phalanx fractures).

treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.").

The other aspect of Plaintiff's claim is that Dr. Larson was deliberately indifferent because he did not have Plaintiff seen by an orthopedist quickly enough. The emergency room instructed Plaintiff to schedule an appointment as soon as possible with an orthopedist, and Dr. Larson likewise wrote that a referral was needed "ASAP." The undisputed evidence shows that Dr. Larson submitted a referral request on February 20, 2023, the same day that Plaintiff returned from the hospital and the day after he injured his finger. It is not clear from the evidence when Dr. Larson's referral request was approved. But Plaintiff's appointment with an orthopedist was not scheduled until April. And it was not until nine weeks after Plaintiff injured his finger that an orthopedist evaluated Plaintiff's finger. However, there is simply no evidence to suggest that Dr. Larson was in any way responsible for the delay or that the delay actually harmed Plaintiff in any way.

The undisputed evidence shows that Dr. Larson very quickly submitted a referral, and after that, he was not personally involved in scheduling Plaintiff's appointment. While Dr. Larson was entitled to rely on other medical personnel to carry out his directives, he is not permitted to turn a blind eye if it was obvious to him that his orders were not being implemented. *Norwood v. Ghosh*, 723 Fed.Appx. 357, 366 (7th Cir. 2018) (citations omitted). The undisputed evidence shows that Dr. Larson was aware by March 20, 2023 (at the very latest)—which was four weeks after Plaintiff sustained his injury and Larson submitted a referral request—that Plaintiff had yet to be seen by an orthopedist.

Page 18 of 24

It is unclear whether Dr. Larson took any action, such as checking on the status of the referral, checking to see if an appointment had been scheduled, etc. (*see* 55-1, p. 4, para. 23; *see also id.* at pp. 26, 29). But even if the Court assumes that Dr. Larson did nothing, Plaintiff did not put forth any evidence as to where or why the breakdown occurred in getting the appointment scheduled or that Dr. Larson had any power to move the ball forward. *See Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002) (explaining that deliberate indifference can result only when delay in care was in control of defendant).

Plaintiff also did not furnish any evidence that the nature of his injury necessitated more immediate treatment from an orthopedist. And during the time that Plaintiff waited to see the orthopedist about his finger, Dr. Larson continued to provide Plaintiff with medical care. Dr. Larson responded to Plaintiff's reports of continued pain by increasing the frequency of Neurontin and, on another occasion, continuing the prescription painkillers for another month. Dr. Larson also ordered repeat x-rays every four weeks (approximately) to monitor Plaintiff's fracture and the healing process.

The Court thus concludes that there is no evidence from which a reasonable jury could conclude that Dr. Larson's actions (or failures to act) amounted to deliberate indifference, particularly in the context of the overall care that Dr. Larson provided to Plaintiff. *Petties*, 836 F.3d at 728 ("[W]e look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs.") (citation omitted).

Finally, the record does not contain any verifying medical evidence that the delay—in either different splinting or seeing an orthopedist—as opposed to Plaintiff's

underlying condition, caused any harm. Plaintiff's statement that Dr. Mulhern told him as much is, again, inadmissible hearsay. It is also completely unsupported by Dr. Mulhern's records. Specifically, Dr. Mulhern stated in his records that by the time he evaluated Plaintiff's finger, the fracture was routinely healing, Plaintiff's pain had improved, and Plaintiff had fairly good movement in his finger. Dr. Mulhern stated that he thought the mallet finger was likely caused by the location of the fracture interfering with the extensor tendon; in other words, the mallet finger was caused by the injury itself, not any delay in treating the injury. Dr. Mulhern also stated that he was "not overly concerned" about Plaintiff's finger and thought it would continue to heal on its own and that further follow-up was likely unnecessary. Dr. Mulhern did not offer any opinion or criticism of Plaintiff's medical treatment at Big Muddy. And he never stated in the records, or even intimated, that the failure to splint Plaintiff's finger or get him to an orthopedist more promptly caused Plaintiff's finger to heal improperly or to require surgical repair. Plaintiff furnished no expert testimony that he could have had a different outcome or less pain if he had gone to Dr. Mulhern immediately. Plaintiff's own opinion that the delay led to permanent damage is, of course, not verifying medical evidence that would allow a reasonable jury to find by a preponderance of the evidence that such causation actually occurred.

To the extent that Plaintiff's finger was not 100% restored to its pre-injury state, that is unfortunate, however, it is not in itself proof of deliberate indifference. Sometimes injuries cannot be completely healed and result in ongoing pain, stiffness, or poor functioning, even with the best possible treatment. *See Snipes v. DeTella*, 95 F.3d 586, 592

(7th Cir. 1996) ("It would be nice if after appropriate medical attention pain would immediately cease, its purpose fulfilled; but life is not so accommodating. Those recovering from even the best treatment can experience pain.") The Constitution only guarantees treatment within the applicable Eighth Amendment standard, not a specific outcome. *Page v. Obaisi*, 318 F. Supp. 3d 1094, 1104 (N.D. Ill. 2018). *See also Brownlow v. Chavez*, 871 F.Supp. 1061, 1064 (S.D.Ind.1994) ("The Eighth Amendment does not guarantee a prisoner's choice of a physician, a mode of treatment or a place of treatment, nor does or could it guarantee a particular outcome or level of comfort in the face of physical maladies.") (citation omitted). In sum, there is nothing in the record that suggests Dr. Larson's treatment of Plaintiff reflected anything close to "total unconcern for the prisoner's welfare in the face of serious risks" *Rasho*, 22 F.4th at 710, or that Larson "knew better than to make the medical decision" he made, *Whiting*, 839 F.3d at 662-63. Accordingly, Dr. Larson is entitled to summary judgment.

### B. NURSE BRIDGET WIGGINS

Plaintiff contends that Nurse Wiggins was deliberately indifferent because she failed to relay his concerns to Dr. Larson about continued bleeding, his fingers being incorrectly taped, the need for a splint on his middle finger, and the need to see a hand surgeon (*see* Doc. 14, Doc. 17, Doc. 55-12, p. 52).

With respect to the continued bleeding, the Court notes that Plaintiff's own statements are the only evidence in the entire record of this issue. There are no records of Nurse Wiggin's dressing changes, and the other medical records do not indicate there was any issue with bleeding. Rather, immediately after Plaintiff's injury, a nurse charted

that Plaintiff's laceration was *not* bleeding. The next day, a nurse practitioner at the hospital emergency department charted the same. None of Plaintiff's requests for medical treatment that he submitted in the two weeks after his injury, or the nurse sick call notes from that same time period, say anything about continued bleeding. That being said, the Court cannot decide on summary judgment whether to believe Plaintiff's story or the story told by his medical records. Assuming that Plaintiff's testimony is probative evidence that a jury could believe, Plaintiff never said how the continued bleeding supposedly caused him any harm, much less provided verified medical evidence of such harm.

Plaintiff's vague assertion that Nurse Wiggins incorrectly taped his fingers and his lay contention that the tape-job caused a deformity to his finger is insufficient to create an issue of fact because Plaintiff is not qualified to comment on whether a particular treatment is proper or that it caused any harm. *See* FED. R. EVID. 701. Furthermore, because Plaintiff could not (or would not) describe how Nurse Wiggins supposedly taped his fingers, no reasonable jury could find the treatment blatantly inappropriate.

Finally, as a nurse, Wiggins had no authority to order treatment for a broken finger, such as a splint or a referral to an orthopedist. Her purported failure to relay Plaintiff's requests to Dr. Larson does not amount to deliberate indifference because Plaintiff was able to make his concerns known through other avenues, including submitting written request forms and in-person complaints at nurse sick call, which garnered him a referral to see Dr. Larson. Plaintiff was subsequently examined by Dr. Larson and had an opportunity to express his concerns to Dr. Larson directly. To the

extent there was a delay between the time that Nurse Wiggins could have told Dr. Larson about Plaintiff's concerns and the time that Plaintiff was able to tell Dr. Larson, as explained above, there is no verifying medical evidence that a delay of any kind in Plaintiff's treatment caused him any harm.

For these reasons, Nurse Wiggins is entitled to summary judgment.

## CONCLUSION

The Motion for Summary Judgment filed by Defendants Dennis Larson and Bridget Wiggins (Doc. 54) is **GRANTED**. Plaintiff's claims are **DISMISSED with prejudice** and the Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants and close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED: July 2, 2026**

_Mark A. Beatty_
_____
**MARK A. BEATTY**
**United States Magistrate Judge**

## NOTICE

Plaintiff is advised that this is a final decision ending his case in this Court. If Plaintiff wishes to contest this decision, he has two options: he can ask the undersigned to reconsider the Order or he can appeal to the Seventh Circuit.

If Plaintiff chooses to go straight to the Seventh Circuit, he must file a notice of appeal in the district court *within 30 days* from the entry of judgment. FED. R. APP. P. 4(a)(1)(A). The deadline can be extended for a short time only if Plaintiff files a motion showing excusable neglect or good cause for missing the deadline and asking for an extension of time. FED. R. APP. P. 4(a)(5)(A), (C). *See also Sherman v. Quinn*, 668 F.3d 421, 425 (7th Cir. 2012) (explaining the good cause and excusable neglect standards); *Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 807 (7th Cir. 2011) (explaining the excusable neglect standard). The current cost of filing an appeal with the Seventh Circuit is $505.00. The filing fee is due at the time the notice of appeal is filed. FED. R. APP. P. 3(e). If Plaintiff cannot afford to pay the entire filing fee up front, he must file a motion for leave to appeal *in forma pauperis* ("IFP motion") along with a recent statement for his prison trust fund account. *See* FED. R. APP. P. 24(a)(1)(C). The IFP motion must set forth the issues Plaintiff plans to present on appeal. *See* FED. R. APP. P. 24(a)(1)(C).

On the other hand, if Plaintiff wants to start with the undersigned, he can file a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e), but such a motion is not required to preserve his appellate rights. Any Rule 59(e) motion *must* be filed within twenty-eight (28) days of the entry of judgment. FED. R. CIV. P. 59(e), and the deadline *cannot* be extended. *See* FED. R. CIV. P. 6(b)(2). Any motion must also comply with Rule 7(b)(1) and state with sufficient particularity the reason(s) that the Court should reconsider the judgment. *Talano v. Nw. Med. Faculty Found., Inc.*, 273 F.3d 757, 760 (7th Cir. 2001). *See also Elustra v. Mineo*, 595 F.3d 699, 707 (7th Cir. 2010) ("This court has held that otherwise timely skeletal motions that fail to satisfy the requirements of FED. R. CIV. P. 7(b)(1) do not postpone the 30–day period for filing a notice of appeal . . . .").

So long as the Rule 59(e) motion is in proper form and filed no later than 28 days after the judgment is entered, the 30-day clock for filing a notice of appeal will be stopped. FED. R.APP. P. 4(a)(4). The clock will start anew once the motion is ruled on. FED. R.APP. P. 4(a)(1)(A), (a)(4), (a)(4)(B)(ii). To be clear, if the Rule 59(e) motion is filed outside the 28-day deadline or "completely devoid of substance," the motion will not stop the clock for filing a notice of appeal, and the clock will expire 30 days from the entry of judgment. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014); *Talano v. Northwestern Medical Faculty Foundation, Inc.*, 273 F.3d 757, 760–61 (7th Cir. 2001); *Martinez v. Trainor*, 556 F.2d 818, 819–20 (7th Cir. 1977). Again, the deadline for filing a notice of appeal can be extended only on a written motion by Plaintiff showing excusable neglect or good cause.